**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Sanjay Wadhwa**
**Alexander M. Vasilescu**
**Sheldon L. Pollock**
**John O. Enright**
**David H. Tutor**
**Christine Ely (not admitted in EDNY; admitted in NY (Bar No. 4737466) and SDNY)**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0024 (Tutor)**
**Email: tutord@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | <u>**COMPLAINT**</u> |
| | : | |
| - against - | : | **1:21-cv-2008** |
| | : | |
| | : | **ECF CASE** |
| **RICHARD DALE STERRITT, JR.** | : | |
| **(a/k/a RICHARD RICHMAN),** | : | **JURY TRIAL** |
| **MICHAEL G. GREER,** | : | **DEMANDED** |
| **DEANNA L. LOONEY,** | : | |
| **ROBERT W. MAGNESS, JR.,** | : | |
| **KATIE MATHEWS,** | : | |
| **JAMES CHRISTOPHER PITTMAN, and** | : | |
| **MARK ROSS,** | : | |
| | : | |
| **Defendants,** | : | |
| -and- | : | |
| | : | |
| **NAOMI ROSS,** | : | |
| **ROBYN L. STRAZA,** | : | |
| **ANGELIKI (a/k/a ANGIE) TOUHOULIOTIS, and** | : | |
| **RAINMAKER ADVISORS, LLC,** | : | |
| | : | |
| **Relief Defendants.** | : | |

-------------------------------------------------------------------- x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Richard Dale Sterritt, Jr. (a/k/a Richard Richman) ("Sterritt"), Michael G. Greer ("Greer"), Deanna L. Looney ("Looney"), Robert W. Magness, Jr. ("Magness"), Katie Mathews ("Mathews"), James Christopher (a/k/a Chris) Pittman ("Pittman"), Mark Ross ("Ross," and, collectively, "Defendants"), and Relief Defendants Naomi Ross ("Naomi"), Robyn L. Straza ("Straza"), Angeliki (a/k/a Angie) Touhouliotis ("Touhouliotis"), and Rainmaker Advisors, LLC ("Rainmaker," and, collectively, "Relief Defendants") alleges as follows:

## SUMMARY

1.      This case concerns an offering fraud in the securities of Zona Energy, Inc. ("Zona") and the public issuer that later acquired Zona, ERF Wireless, Inc. ("ERFB"), as well as a related market manipulation scheme in another publicly traded company, OrgHarvest, Inc. ("ORGH").  The mastermind and orchestrator of the schemes was Sterritt, a criminal securities fraud recidivist who used the alias "Richard Richman" to hide his criminal history from investors and carry out the fraud.

2.      From March 2018 through at least November 2020, Sterritt and his co-defendants raised more than $16 million from more than 300 investors through a purported private placement of Zona (and later, ERFB) common stock in nationwide offerings, making various material false statements and omitting to disclose material facts to investors.

3.      Instead of using the offering proceeds for the corporate purposes disclosed to investors, Sterritt and certain of the other Defendants, including Greer and Looney, misappropriated most of these proceeds through a number of Sterritt-controlled companies. Defendants then used the misappropriated funds for personal expenses, including to purchase a Bentley, to pay for travel, and to pay for purchases at restaurants, retailers, and gas stations.

2

4.     In addition to the Zona/ERFB offering fraud, Defendants also manipulated the market for the common stock of ORGH, a purported cannabis production company that Sterritt controlled.

5.     In February 2020, Sterritt and Magness arranged for the deposit of 5,250,000 shares of ORGH's common stock at a U.S. brokerage firm (the "Brokerage Firm").  Sterritt, Magness, Ross, and another individual planned to conduct a series of matched trades in ORGH's common stock in advance of an intended pump and dump of the stock.[1]

6.     Unbeknownst to them, however, Sterritt, Magness, and Ross were discussing the planned matched trading scheme on recorded phone calls and in preserved email and text message communications.

7.     Sterritt, Magness, and Ross were introduced to an individual claiming to be the leader of a network of corrupt stockbrokers who would buy for their customers' accounts—and without the knowledge of those customers—stock that Magness and Ross sold in the open market, in exchange for an agreed upon 35% kickback.  Unbeknownst to Sterritt, Magness, and Ross, the purported leader of the corrupt broker network was an undercover agent (the "UC") for the Federal Bureau of Investigation ("FBI").

8.     On every trading day between May 19 and May 29, 2020, Sterritt, Magness, and/or Ross agreed in advance with the UC on the number of ORGH shares to trade and the price at which to trade them.  They then coordinated and carried out the matched trading over recorded

---

[1]     In a "pump and dump" scheme, a group of individuals who control the "free trading" shares of an issuer with a thinly-traded stock, also referred to as the issuer's "float," inflate the issuer's share price and trading volume through, among other things, engaging in wash and matched trading, issuing false or misleading press releases, and paying for stock promotions.  When the issuer's share price reaches a desirable level or target price, the individuals "dump" their shares into the buying volume generated during the "pump" phase for substantial financial gain.

3

conference calls and in preserved text messages, selling, in total, 20,400 shares of ORGH.  Their pump-and-dump plan was stymied, however, when the Commission suspended trading in ORGH's securities on June 1, 2020, for a period of ten business days.

9.      Undeterred, Sterritt almost immediately began planning a similar market manipulation scheme in the common stock of ERFB, another microcap issuer he controlled. Sterritt induced investors to purchase Zona stock based, in part, on the promise of a share exchange between Zona and ERFB.  After the exchange occurred on June 29, 2020, Sterritt and other Defendants continued to sell preferred ERFB stock from Sterritt-controlled entities.

10.      Sterritt planned to again conduct matched trading with the UC, now in ERFB, to attempt to pump and dump ERFB stock, but his plans were thwarted when the Commission suspended trading in ERFB's securities on February 4, 2020, for a period of ten business days.

11.      As a result of their offering fraud and related market manipulation schemes, Defendants obtained more than $16 million in total illicit proceeds.  At least $2.8 million of these ill-gotten gains were transferred to the Relief Defendants.

## **VIOLATIONS**

12.      Based on the conduct alleged in this Complaint:

(a) Sterritt violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c) and 77q(a)], and Sections 9(a), 10(b), and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a), 78j(b), and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b) Greer violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (a)(3)], and Sections 10(b) and 15(a) of the

Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

(c) Looney violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (a)(3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

(d) Magness violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (a)(3)], and Sections 9(a) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

(e) Mathews violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (a)(3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

(f) Pittman violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (a)(3)], and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78(o)(a)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

(g) Ross violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (a)(3)], and Sections 9(a), 10(b), and 15(a) of the Exchange Act [15 U.S.C. §§ 78i(a), 78j(b), and 78o(a)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

(h) Relief Defendants Naomi, Straza, Touhouliotis, and Rainmaker received funds from Defendants for which they gave no consideration and to which they have no right or legitimate claim.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

13.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking to permanently enjoin the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein.  The Commission also seeks a final judgment: (a) ordering the Defendants to disgorge their ill-gotten gains, on a joint and several basis, together with prejudgment interest thereon, and to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (b) imposing a penny stock bar order against each of the Defendants pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; (c) entering an officer-and-director bar against Sterritt, Looney, Magness, Mathews, and Pittman, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (d) ordering Relief Defendants jointly and severally with Defendants to disgorge or return their ill-gotten gains and to pay prejudgment interest thereon; and (e) ordering any other and further relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue is proper in the Eastern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Among other things, certain of the Defendants solicited investors residing in the District using false and misleading offering materials, and investors residing in the District purchased shares of Zona common stock in the Defendants' unregistered fraudulent offering.

## DEFENDANTS

16.     **Sterritt (a/k/a Richman),** age 64, resides in Garland, Texas.  He is not registered with the Commission in any capacity and does not hold any securities licenses.  In April 2003, Sterritt pleaded guilty in U.S. District Court for the Northern District of Texas to an indictment charging him with conspiracy to commit securities fraud, money laundering, and filing false income tax returns.  He was sentenced to five years imprisonment.  Sterritt is the undisclosed control person of multiple public issuers, including, but not limited to, ERFB and ORGH, and private companies, including, but not limited to, Zona, Accordant Services, Inc. ("Accordant"), Legal Metrics, Inc. ("Legal Metrics"), Richman Energy Inc. ("Richman Energy"), and Richman Organization, Inc. ("Richman Organization").

17.     **Greer,** age 45, resides in Dallas, Texas and is a friend of Sterritt.  He is not registered with the Commission in any capacity and does not hold any securities licenses.  He has been an officer of Accordant and Richman Organization.  In 1995, he was convicted of burglary in Texas.

18.     **Looney**, age 53, resides in Fort Worth, Texas and is an employee of Sterritt and of other entities Sterritt controls, including Accordant.  At times, she has described herself as a "Paralegal to Richard Richman."  She is also an officer of ERFB and a Director of Legal Metrics, both entities Sterritt controls.  She is not registered with the Commission in any capacity and does not hold any securities licenses.

19.     **Magness**, age 51, resides in New York, New York and is a friend of Sterritt.  He owns a clothing store in Manhattan.  He is a Director of Legal Metrics and formerly was the sole Director of Zona Resources, Inc., both entities Sterritt controls.  He is not registered with the Commission in any capacity and does not hold any securities licenses.

20.     **Mathews**, age 57, resides in Garland, TX and is an employee of Sterritt and other entities Sterritt controls.  Mathews is also a Director of Zona and its Corporate Secretary.  She is not registered with the Commission in any capacity and does not hold any securities licenses.

21.     **Pittman**, age 49, resides in Dallas, Texas and is a friend of Sterritt.  He is a lawyer licensed to practice in Texas, and a managing member and co-founder of a law firm specializing in real estate and business transactions.  Pittman is also a Director of Zona.  He is not registered with the Commission in any capacity and does not hold any securities licenses.

22.     **Ross,** age 53, resides in Miami, Florida and is a friend of Sterritt.  While Ross is not currently registered with the Commission, he was a registered representative associated with various registered broker-dealers between approximately October 1985 and November 2007.  During that time, he held Series 4, 7, 24, 55, and 63 licenses.  In 2007, the Financial Industry Regulatory Authority ("FINRA") suspended and fined Ross for certain anti-money laundering violations.  In 2008, FINRA expelled Ross from the securities industry for his failure to pay the fines imposed on him in connection with the 2007 disciplinary action.

## RELIEF DEFENDANTS

23.     **Naomi,** age 25, is a resident of Los Angeles, California and is Ross's daughter and a girlfriend of Sterritt.  She is not registered with the Commission in any capacity and does not hold any securities licenses.  At Sterritt's direction, Naomi received approximately $160,855 in investor proceeds.

24.     **Straza**, age 58, is a resident of Dallas, Texas and is Sterritt's ex-wife.  She is not registered with the Commission in any capacity and does not hold any securities licenses.  She is a licensed cosmetic esthetician and owns a skincare spa.  She is also an officer of entities Sterritt controls.  She received approximately $2,102,741 in investor proceeds.  In 2000, a jury in a private civil action found that Straza engaged in a conspiracy to commit securities fraud with Sterritt in connection with a prior similar scheme.  *See Stewart Rahr v. R. Dale Sterritt et al.*, No. 3:99-V-0628-G (N.D. Tex. June 26, 2000).

25.     **Touhouliotis**, age 39, is a resident of Austin, Texas and is a girlfriend of Sterritt. She is not registered with the Commission in any capacity and does not hold any securities licenses.  She received approximately $140,485 in investor proceeds.

26.     **Rainmaker** is a limited liability corporation incorporated in Texas with its principal place of business in Dallas, Texas.  Rainmaker is not registered with the Commission and is not a Commission reporting company.  Rainmaker is beneficially owned by a former consultant to Richman Energy.  Ultimately, approximately $448,000 in investor proceeds were paid to Rainmaker.

## RELEVANT ISSUER

27.     **Zona** was a privately held Texas corporation with its principal place of business in Dallas, Texas.  Zona described itself in marketing materials as a "portfolio company of a

9

family office focused on a generational opportunity in the independent oil and natural gas industry focused on the acquisition, development, exploration and exploitation of unconventional, onshore oil and natural gas reserves in the Permian Basin in West Texas."  On June 29, 2020, a wholly-owned subsidiary of ERFB, Zona Resources, Inc. ("Zona Resources"), announced that it had completed a share exchange with Zona, whereby Zona shareholders received shares of ERFB.  Following the share exchange, Zona ceased to exist as a separate corporation.

**OTHER RELEVANT ENTITIES**

28.     **ORGH** was originally incorporated in Delaware on September 2, 1997 as an auto-towing business under a different name.  In May 2018, after multiple business and name changes, the company adopted the name "OrgHarvest, Inc." and announced plans to produce cannabis.  ORGH currently has its principal place of business in Dallas, Texas.  ORGH's common stock was formerly quoted on OTC Link (formerly "Pink Sheets"), operated by OTC Markets Group, Inc., under the symbol ORGH; it is currently listed on OTC Markets' Expert Market with a "Caveat Emptor" designation.  On June 1, 2020, the Commission suspended trading in the securities of ORGH for ten business days.  ORGH is not currently reporting to the Commission.

29.     **ERFB** was originally incorporated in Texas in 1999 as FleetClean Systems, Inc. In 2004, the company changed its name to ERF Wireless, Inc. and moved its state of incorporation to Nevada.  ERFB currently has its principal place of business in Dallas, Texas. ERFB's common stock was formerly quoted on OTC Link under the symbol ERFB; it is currently listed on OTC Markets' Grey Market with a "Caveat Emptor" designation.  ERFB allegedly "provides wireless communications products and services," and describes itself as

having "long been associated with the energy sector by and through its provision of wireless internet and other services in the exploration, drilling, and production phases of oil and gas." On November 5, 2014, the Commission issued a settled order instituting cease-and-desist proceedings against ERFB pursuant to Section 21C of the Exchange Act for the company's failure to disclose the issuance of unregistered shares and the existence of a related financing agreement in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder. ERFB was ordered to cease-and-desist from committing violations and to pay a $50,000 civil penalty. ERFB was registered with the Commission under Section 12(g) of the Exchange Act from September 27, 1999 to December 29, 2016, when it filed a Form 15 to suspend its registration obligation. On February 4, 2021, the Commission suspended trading in the securities of ERFB for ten business days.

## FACTS

### I.      The Zona Offering Fraud

*a.      Zona Acquires Leasehold Interests on the La Escalera Ranch and Becomes Subject to $20 Million of Demand Notes*

30.      The La Escalera Ranch (the "Ranch") is a 220,000-acre working cattle ranch in the oil-and-natural-gas-rich Permian Basin region of West Texas. Over time, the owners of the Ranch have leased mineral rights to various third-party sub-lessors.

31.      On April 14, 2018, Le Cle Minerals, Inc. ("Le Cle"), a company Sterritt controlled through an associate he had installed as its CEO, agreed to purchase certain leasehold mineral rights on the Ranch from one of these third-party sub-lessors. Relief Defendant Straza is the current Director of Le Cle.

32.     On April 15, 2018, Le Cle assigned the leasehold mineral rights it had just acquired to Richman Energy, another company Sterritt controlled through a friend he had installed as its CEO.

33.     On May 30, 2018, Richman Energy, in turn, assigned the same leasehold interest to Zona.  In connection with this sublease, Zona also signed demand notes indebting Zona to Richman Energy for at least $20 million.

34.     The terms of the Ranch's lease assignment obligated Zona to drill an initial well by August 31, 2018 or, in the alternative, to extend the lease agreement or pay liquidated damages.  The lessee also was required to maintain a continuous drilling program of at least two wells a year starting in 2019, and to abide by a contract that called for annual acquisition payments totaling over $12 million by 2022.  If Zona failed to meet the terms of this contract, the lease was subject to immediate termination.

   *b.*     *The Zona Offering Fraud*

35.     Beginning as early as April 2018, Sterritt and other Defendants began selling Zona shares, using the leasehold mineral interests on the Ranch as a way to attract investors.

36.     Zona did not register the offering of its common stock with the Commission and no exemption from the registration requirements applied.

37.     Typically, a prospective investor was first provided with an offering summary (the "Zona Summary") describing the initial sale of three million shares of Zona stock at $1.00 per share, purportedly offered in reliance upon the exemption from registration found in Rule 506(b) of Regulation D under the Securities Act.  According to the Zona Summary, the offering proceeds were to be used for "leasehold acquisitions and for other general business purposes."

38.     Sterritt instructed fundraisers to first send the Zona Summary to a prospective investor, and then, after an investor expressed interest, to send a separate promotional slide deck (the "Zona Presentation" and, together with the Zona Summary, the "Zona Offering Materials"). The Zona Summary also incorporated by reference the Zona Presentation, stating, "For a detailed summary of the initial acquisition of 6,500 acres, and the twelve planned wells, as well as a more detailed summary of the entire La Escalera ranch play, please see the attached power point [*sic*] presentation."

39.     The Zona Summary contained false and misleading statements, including, among other things, (1) that certain individuals served as Zona's "management," even though Sterritt controlled the company and neither his role, nor his prior criminal history, was disclosed; (2) that a respected geologist and energy consultant who had been retained by the original lessor, was a member of Zona's "management," when he was not; (3) that the drilling project would "provide immediate cash flows"; and (4) that there was "little risk in making a commercially viable well."

40.     The Zona Presentation falsely claimed the company's "Debt" was "$0.00M," and that it had "no debt," and a "corporate policy of no debt" when in fact Zona had taken on at least $20 million in debt when it issued demand notes in connection with its acquisition of the leasehold interest from Richman Energy on May 30, 2018.  The Zona Presentation failed to disclose the significant debt Zona had assumed in the form of demand notes issued to Richman Energy.

41.     The Zona Presentation likewise misleadingly described several people as members of Zona's management and "Advisory Team," including the respected geologist, even though Sterritt, a securities fraud felon, actually controlled the company.

42.     The Zona Presentation also failed to note the minimum drilling requirements necessary to maintain the leasehold interests, and the substantial projected annual acquisition payments.

43.     While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Sterritt, Greer, Magness, Pittman, and Ross each used the false and misleading Zona Offering Materials to solicit investors.

44.     While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Magness recruited a consultant for his luxury men's clothing store to solicit investors and, using the Zona Offering Materials, sold Zona shares to his former fashion industry colleagues.

45.     While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Greer emailed the Zona Offering Materials to several prospective investors, at least one of whom bought Zona shares.

46.     While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Pittman emailed the Zona Offering Materials to sell shares to executives at a family-owned investment services firm to which he provided legal services on an ongoing basis.

47.     While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Ross sent the Zona Offering Materials to multiple investors and focused his selling efforts on elderly investors, including soliciting a disabled woman in her 90s and convincing her to host a country club luncheon in Palm Beach, Florida, at which Sterritt gave a presentation on Zona to other retirees.

48.     While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Sterritt used the Zona Offering Materials to target investors through a network of individuals who stood to personally benefit from his scheme, repeatedly offering insiders, friends, and acquaintances the opportunity to buy Zona shares at a discount in exchange for recruiting their own friends, family, co-workers, and clients to invest.

49.     For example, Sterritt and Pittman became acquainted with three dually-registered investment adviser individuals/registered representatives at a dually-registered investment adviser/broker-dealer firm, and, in exchange for their commitment to raise at least $3 million, allowed the representatives to buy Zona shares for as little as $0.04/share, compared with the $1.00/share or $2.50/share price typically offered to other investors.

50.     For his investor solicitation efforts, Ross received from entities Sterritt controlled purported "consulting" fees, which were undisclosed to investors.

51.     Once a prospective investor expressed interest in purchasing Zona shares, the investor typically was instructed to contact Mathews, a Zona employee, to finalize the investment.

52.     The Zona Presentation described Mathews as Zona's "Director, Corporate Secretary, & Investor Relations," and, when corresponding with investors, Mathews used an "@zonaenergy.com" email address with a signature describing her as the company's corporate secretary.

53.     At Sterritt's direction, and while knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Mathews arranged for investors to purchase Zona shares not only directly from the company, but also directly from a number of other Sterritt-controlled entities, including Accordant, Richman Energy, and Richman

Organization.  While knowingly or recklessly disregarding the material false and omitted statements in the Zona Offering Materials, Mathews also facilitated the sale of Zona shares to investors that Greer personally held.

54.  After investors contacted Mathews, she provided each investor with a securities purchase agreement for Zona shares and wiring instructions specifying one of several bank accounts—often in the name of one of the other Sterritt-controlled entities, such as Richman Energy, Richman Organization, or Accordant—to which each investor should wire his or her funds.

55.  Mathews knew or recklessly disregarded that Sterritt controlled the entities to which investors wired funds, and further knew that much of the funds transferred among these entities were never wired to Zona and were never used for Zona's corporate purposes.

56.  Although Sterritt had no formal role with Zona, Mathews acted at his direction, tracking the funds raised from the sale of Zona shares in extensive investor tracking spreadsheets that Sterritt "reviewed and approved."

57.  Looney sometimes played Mathews's role, giving investors directions about how to complete their share purchases and providing them with wiring instructions.

58.  Looney knew or recklessly disregarded that Sterritt controlled the entities to which investors wired funds, and further knew that much of the funds transferred among these entities were never wired to Zona and were never used for Zona's corporate purposes.

59.  Looney usually signed investors' securities purchase agreements as an officer and on behalf of the entity under Sterritt's control that was selling the shares.

60.  When Greer sold to investors Zona shares that he personally held, he personally signed the securities purchase agreements.

61.     Regardless of whether an investor purchased Zona shares from the company, another Sterritt-controlled entity, or Greer, it was Looney or Mathews who communicated with Zona's transfer agent to complete the transfer of shares to the investor.

62.     In total, from March 2018 through November 2020, Defendants raised more than $16 million from at least 300 investors located throughout the United States in the unregistered offering of Zona/ERFB shares:

> a.   Richman Energy received over $10 million;
>
> b.   Richman Organization received over $2.5 million;
>
> c.   Accordant received over $1.8 million;
>
> d.   Greer received over $850,000; and
>
> e.   Zona received over $800,000.

*c.     The Misappropriation of Zona Investor Funds*

63.     Through the Zona Offering Materials and their oral representations, Defendants falsely represented to Zona investors that investor funds would be used to support Zona's operations, namely, to develop the mineral rights on the Ranch.

64.     The Zona Summary, for instance, stated that offering proceeds would be used for "leasehold acquisitions and for other general business purposes," and "to fund legal and administrative expenses for th[e] offering."

65.     But instead of using the funds raised in the Zona offering to develop a drilling program on the Ranch, Sterritt stole most of the funds.

66.     Investor money raised from Zona share sales was regularly transferred among bank accounts for entities Sterritt controlled, including Richman Energy, Richman Organization, and Accordant, as well accounts Greer controlled.

67.    On November 22, 2019, a then-Richman Energy employee complained in an email to Sterritt, Mathews, Pittman, Looney, and other senior Zona employees that "over 90% of the time" these intercompany transfers of investor funds appeared to have "no notes or documentation," that "no apparent business purpose existed as a rationale for such transfers," and that "[n]o true cash management protocols nor internal controls . . . [were] in place at most if not all the Richman related companies."

68.    The employee opined that "most outside accounting firms would [not] even touch any of the books of the Richman related companies," and the situation was "[s]o bad it looks intentional and nefarious."

69.    Sterritt terminated this employee less than a month later.

70.    Sterritt used investor funds from the bank accounts he controlled and those in Greer's name to pay his own personal expenses, to purchase numerous luxury goods, to give cash to family, friends, and girlfriends (including Relief Defendants Naomi, Straza, and Touhouliotis), and to fund other unrelated businesses in which he had an interest.

71.    For example, in January 2019, two Sterritt-controlled bank accounts with close to zero balances received deposits for the purchase of Zona shares from 39 investors, totaling over $1.5 million.  Sterritt immediately misappropriated a majority of those funds, including by transferring $636,000 to Relief Defendant Straza, $60,000 to Greer, $30,000 to Relief Defendant Rainmaker, and over $25,000 to Relief Defendant Touhouliotis and her family.

72.    Sterritt also used more than $50,000 of these investor proceeds to purchase a Bentley (which Looney registered in Greer's name), and spent thousands of dollars on purchases at restaurants, gas stations, and retailers.

73.     In March 2020, Sterritt asked an individual who had previously invested in Zona to contribute funds to ORGH, a cannabis company of which Sterritt was trying to gain control. The investor declined to invest in ORGH but said that he would invest more in Zona, promptly sending funds to a Sterritt-controlled bank account for that purpose.  The very next day, the investor's funds were wired to ORGH.

74.     Zona investor money was also used to fund Ponzi-like payments to dissatisfied earlier investors.

75.     For example, in January 2020, a former Richman Energy employee exposed Sterritt's true identity when he emailed a number of investors and attached a photocopy of Sterritt's driver's license with his real name.  At least one investor confronted Sterritt and demanded the return of his $30,000 contribution.  Although Zona had produced no revenue from drilling, in March 2020 Sterritt used new investor funds to return the dissatisfied investor's $30,000 as well as $900 in interest.

76.     Like Sterritt, Greer misappropriated money from the sale of Zona shares, using these funds for Sterritt's unrelated businesses, to wire cash to Relief Defendant Naomi and a family member of Relief Defendant Touhouliotis, to withdraw cash for himself, and to make numerous restaurant and retail purchases.

77.     Looney, too, misappropriated funds.  For example, Looney was a signatory to a bank account for Accordant, and caused Accordant to transfer millions of dollars to Sterritt's other businesses and to his personal associates, including hundreds of thousands of dollars to both Greer and Relief Defendant Straza.  Additionally, at least $29,000 of investor funds were used to pay for Looney's luxury Dallas apartment.

## II.     The ORGH Manipulation

78.     Sterritt intended to use Zona to enable him to gain control of a public issuer and then pump and dump the stock of the targeted issuer.

79.     In January 2020, in furtherance of this scheme, Sterritt gained control of ORGH when several entities and trusts set up in the names of his family members and close friends tendered Zona shares to the previous controlling shareholders of ORGH in exchange for ORGH shares.

80.     Mathews then created a spreadsheet for Sterritt that detailed the number of ORGH shares owned by each of the various entities and trusts under Sterritt's control and showed that, together, they comprised a controlling interest in ORGH.

81.     Legal Metrics, of which Magness and Looney are Directors, was one of the entities that exchanged Zona shares for ORGH shares.

82.     In February 2020, at Sterritt's direction, Magness opened an account at the Brokerage Firm in the name of Legal Metrics and deposited 5,250,000 ORGH shares there.

83.     Later, in May 2020, Magness obtained trading authority for Ross on the Legal Metrics account at the Brokerage Firm.

84.     Sterritt, Magness, and Ross planned to use the Legal Metrics account at the Brokerage Firm to pump and dump ORGH stock using matched trading.

85.     After Sterritt was introduced to the UC, Sterritt reassured the UC that he would control the sale of ORGH stock by Legal Metrics, stating that he had a "hundred percent control" over the shares deposited at the Brokerage Firm.

86.     Sterritt engaged in the matched trading scheme to liquidate the ORGH shares he controlled and create the misleading appearance of active trading in ORGH, telling the UC that

he ultimately wanted to sell 40 to 50 million ORGH shares he controlled at a target price of $2 per share.

87.     Magness hoped that Sterritt would compensate him for his role in the matched trading scheme, stating on a recorded call, "the more that comes in, the more chance I have of getting a little."

88.     From May 19 to May 29, 2020, Sterritt and Magness unknowingly matched trades with the UC on every trading day, typically coordinating the trades through three-way conference calls and/or preserved text messages.

89.     For example, on May 19, 2020, Sterritt, Magness, and the UC agreed ahead of time, on a recorded conference call, on the number of ORGH shares to trade and the price at which to trade them, with Sterritt stating, "A thousand at 99."

90.     Then, keeping the conference line with Sterritt and the UC open, Magness called a registered representative at the Brokerage Firm on a separate phone line to place the order at the pre-arranged price, just below the best offer, stating, "[s]o we're going to – the – I'm going to do a – let's do a thousand at .99."

91.     As soon as the registered representative posted the offer, the UC placed a buy order, purchasing the shares offered by Legal Metrics and completing the matched trade.

92.     In addition to conference calls, Sterritt arranged matched trades with the UC over preserved text messages.  For example, on May 20, 2020, Sterritt exchanged the following text messages with UC while facilitating the matched trading:

| Time Stamp UTC | Sender | Message | Notes |
|---|---|---|---|
| 5/20/20 16:58 | RS to UC | What time we going today | |

| | | | |
|---|---|---|---|
| 5/20/20 17:11 | UC to RS | Does around 2 pm NY time work? | |
| 5/20/20 17:14 | RS to UC | Yes | |
| 5/20/20 17:17 | UC to RS | Good. I'll call you around that time. Then Rob can get [the Brokerage Firm registered representative] on speaker and offer 1,300 shares. Talk soon. | |
| 5/20/20 17:17 | RS to UC | K | |
| 5/20/20 17:53 | UC to RS | What price will you be offering it at? | |
| 5/20/20 17:54 | RS to UC | .98 | |
| 5/20/20 17:54 | RS to UC | You want me the put it in now? | |
| 5/20/20 17:54 | RS to UC | $0.98 | |
| 5/20/20 17:56 | UC to RS | Wait for me to call you before putting it in. I will plan to bid .98 after we chat. | |
| 5/20/20 18:06 | | | UC calls RS |
| 5/20/20 18:13 | UC to RS | Filled | |
| 5/20/20 18:14 | RS to UC | We got it | |
| 5/20/20 18:14 | RS to UC | Confirmed | |
| 5/20/20 18:14 | RS to UC | [Thumbs Up Emoji] | |
| 5/20/20 18:15 | UC to RS | [Thumbs Up Emoji] Have a great night. Chat tomorrow. | |

93.     On May 26, 2020, Sterritt sent a first wire payment to the UC from a bank account in the name of Greer to compensate the UC and his brokers for, as Sterritt believed, engaging the matched trading scheme.

94.     On May 29, 2020, Ross and the UC agreed on a pre-arranged number of shares to trade that day at a pre-arranged price, with Ross stating to the UC, "[s]o I told [the registered

representative at the Brokerage Firm] before at 165.  I just got to tell him to put it in."  When the UC responded, "I'll bid for it at a buck 65 and we'll take you guys out," Ross replied, "Terrific."

95.     Later the same day, on May 29, 2020, Legal Metrics sold 3,061 shares of ORGH in the open market to the UC at a price of $1.65/share.

96.     In total, over the eight trading days during the period May 19 to May 29, 2020, Sterritt, Magness, and Ross executed matched trades with the UC for thousands of shares at prices increasing from $0.99 per share to $1.72 per share.

97.     Sterritt, Magness, and Ross's plan to increase the price of ORGH and eventually liquidate their shares was thwarted when, on June 1, 2020, the Commission suspended trading in ORGH's securities for a period of ten business days.

98.     Sterritt, Magness, and Ross each knew that their conduct was illegal.

99.     For example, Sterritt intended to disguise kickback payments to the UC as marketing fees.  He also planned to explain away communications with the UC about pricing for the matched trades as, instead, related to a fictitious business to sell face masks during the COVID-19 pandemic.

100.    Sterritt also suggested using Bitcoin to make payments to the UC because it would "be the safest way" to conceal the payments.

101.    After the trading suspension, Magness flew to Dallas, TX and met with Sterritt on June 7, 2020, to discuss how to cover their tracks.  During that meeting, which was recorded, Magness stated, "the only way this could ever come back to us" was if the UC identified Magness as the sender of text messages coordinating the matched trading.

102.    Ross, for his part, arranged for pre-paid mobile phones to be sent for him, Sterritt, and the UC, so that (he believed) their phone calls could not be recorded.

III.     **The ERFB Share Exchange and Planned ERFB Manipulation**

103.     After the Commission suspended trading in ORGH, Sterritt attempted to conduct the same manipulative trading scheme in ERFB, another microcap issuer he controls, through shares held by friends, family, and trusts and entities set up in their names.

104.     Sterritt's control of ERFB is not disclosed in any of ERFB's public filings.

105.     Rather, Sterritt's employees and friends, including Looney, are listed as the company's officers and directors, masking Sterritt's involvement while allowing him to control the company's corporate actions.

106.     On or around June 29, 2020, Zona and ERFB conducted a share exchange, whereby Zona investors received Series C Preferred shares of ERFB when ERFB's wholly-owned subsidiary, Zona Resources (formed in the first quarter of 2020, initially with Magness as its President), acquired Zona as a wholly-owned subsidiary.

107.     Both before and after the share exchange occurred, Sterritt used it as a way to advance his offering fraud scheme and mislead investors.

108.     For example, the Zona Presentation included as a "Path to Development" a goal to "[a]ccomplish share exchange of Zona shareholders by publicly traded company."

109.     Following the share exchange, an email purportedly authored by Sterritt's installed CEO of Zona to existing Zona investors titled "Message from the CEO" stated:

> The investment by ERF wireless [*sic*] in Zona provides the mechanism to maximize shareholder value by providing our shareholders with a path to the public market for valuation and liquidity.  ERF plans to add additional assets to the portfolio in coming periods and those assets are expected to provide additional value to our current Zona shareholders.  We believe that the potential for growth under the ERF umbrella, combined with the Zona assets, will accelerate future returns to our shareholder base.

110.    This statement was false and misleading:  ERFB had no concrete plans to add assets to its portfolio and Zona was by then at risk of having its La Escalera Ranch leases terminated based on Zona's failure to satisfy the lease terms.  Rather, Sterritt used statements like this one to induce existing Zona investors to purchase additional ERFB Preferred C shares.

111.    On November 19, 2020, ERFB applied with FINRA for (1) a 10,000-to-1 reverse split of the company's outstanding stock, and (2) a corporate name change to "Zona."

112.    On January 28, 2021, FINRA issued a deficiency letter to ERFB declining to process the company's application, citing FINRA Rule 6490 (Processing of Company-Related Actions), the Company's failure to be current in its former reporting requirements, and the November 2014 cease-and-desist order.  Nonetheless, on the very same day, ERFB issued a press release (the "January 28 Release") announcing that "the Effective Date of [ERFB's] reverse split of common stock in a ratio of 10,000 to 1 will be 5:00 p.m. EST on January 28, 2021."

113.    This inaccurate information had an immediate effect on the market for ERFB shares—in the minutes following this press release, well over a million ERFB shares were sold.

114.    On February 4, 2021, the Commission suspended trading in ERFB's securities for a period of ten business days.

115.    On February 5, 2021, ERFB issued a new press release (the "February 5 Release") that purported to correct the January 28 Release.

116.    The February 5 Release stated that the reverse split did not occur "due to inaccurate advice from an outside technical advisor," and that "[t]his error has also caused a ten-day trading halt as directed by the SEC."  This statement was false—the reverse split did not occur because of "inaccurate advance from an outside technical advisor," but for the reasons

FINRA explained in its deficiency letter. Moreover, that "error" did not cause the SEC's trading halt; rather, as the Commission stated in its release, it suspended trading "because of questions regarding the accuracy and adequacy of information in the marketplace, including, but not limited to, information in a January 28, 2021 press release issued by ERFB concerning certain corporate actions by ERFB."

117.    Before the Commission suspended trading in ERFB, Sterritt had discussed with the UC plans to begin matched trading in ERFB following the purported processing of the reverse split, as well as plans to dump his shares on unsuspecting investors as the price of ERFB stock rose.

## IV.    The Relief Defendants Received Ill-Gotten Gains

### a.    Straza

118.    From April 30, 2018 through November 23, 2020, Straza received a total of $2,102,741 in investor proceeds from the Zona offering. Straza did not have a legitimate claim to these funds.

119.    The $2,102,741 received by Straza from the proceeds of the Zona offering constitutes ill-gotten gains derived from Defendants' violations alleged in this Complaint.

### b.    Naomi

120.    From May 9, 2019 through September 1, 2020, Naomi received a total of $160,855 in investor proceeds from the Zona offering. Naomi did not have a legitimate claim to these funds.

121.    The $160,855 received by Naomi from the proceeds of the Zona offering constitutes ill-gotten gains derived from Defendants' violations alleged in this Complaint.

   c.      *Touhouliotis*

122.    From December 14, 2018 through November 23, 2020, Touhouliotis received a total of $161,485 in investor proceeds from the Zona offering.  Touhouliotis did not have a legitimate claim to these funds.

123.    The $161,485 received by Touhouliotis from the proceeds of the Zona offering constitutes ill-gotten gains derived from Defendants' violations alleged in this Complaint.

   d.      *Rainmaker*

124.    From September 25, 2018 through December 17, 2019, Rainmaker received a total of $448,456.92 in investor proceeds from the Zona offering.  Rainmaker did not have a legitimate claim to these funds.

125.    The $448,456.92 received by Rainmaker from the proceeds of the Zona offering constitutes ill-gotten gains derived from Defendants' violations alleged in this Complaint.

### FIRST CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c)**
**(All Defendants)**

126.    The Commission repeats, realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

127.    The shares of Zona stock that the Defendants sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

128.    At all relevant times, the shares of Zona stock that the Defendants sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

129.     The Defendants therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

130.     By reason of the activities described herein, the Defendants, singly or in concert, directly or indirectly, violated, and, unless enjoined and restrained, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and e(c)].

### SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Sterritt)**

131.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 125, as if fully set forth herein.

132.     Defendant Sterritt, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

133.     By reason of the foregoing, Defendant Sterritt, directly or indirectly, has violated, and, unless enjoined and restrained, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CLAIM FOR RELIEF
**Violations of Securities Act Section 17(a)(2)**
**(Sterritt)**

134.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 125, as if fully set forth herein.

135.    Defendant Sterritt, directly or indirectly, in the offer and sale of securities, by the

use of the means and instruments of transportation and communication in interstate commerce

and of the mails, knowingly or with reckless disregard for the truth, obtained money or property

by means of any untrue statement of material fact or any omission to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

136.    By reason of the foregoing, Defendant Sterritt, directly or indirectly, violated,

and, unless enjoined and restrained, will continue to violate, Section 17(a)(2) of the Securities

Act [15 U.S.C. § 77q(a)(2)].

### FOURTH CLAIM FOR RELIEF
**Violations of Sections Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**Thereunder**
**(All Defendants)**

137.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 125, as if fully set forth herein.

138.    The Defendants, in connection with the purchase or sale of securities, directly or

indirectly, singly or in concert, by the use of the means or instrumentalities of interstate

commerce, or of the mails, or of the facilities of a national securities exchange, with scienter,

have employed devices, schemes, and artifices to defraud, and have engaged in transactions, acts,

practices, and courses of business which operated as a fraud or deceit.

139.    By reason of the foregoing, the Defendants directly or indirectly, have violated, and, unless enjoined and restrained, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## FIFTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (All Defendants)

140.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 125, as if fully set forth herein.

141.    The Defendants, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) employed devices, schemes or artifices to defraud; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

142.    By reason of the foregoing, the Defendants, singly or in concert, directly or indirectly, have violated, and, unless enjoined and restrained, will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 9(a) of the Exchange Act
### (Sterritt, Magness, Ross)

143.    The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

144.    Defendants Sterritt, Magness, and Ross, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, for the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a

false or misleading appearance with respect to the market for any such security (A) effected transactions in a security which involved no change in the beneficial ownership thereof; (B) entered an order or orders for the purchase of the security with the knowledge that an order or orders of substantially the same size, at substantially the same price, for the sale of the security had been or would be entered by or for the same or different parties; or (C) entered any order or orders for the sale of the security with the knowledge that an order or orders of substantially the same size, at substantially the same price, for the purchase of the security had been or would be entered by or for the same or different parties.

146.     Defendants Sterritt, Magness, and Ross, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, together and with other persons, effected a series of transactions in a security not registered on a national securities exchange, creating actual or apparent active trading in such security and raising the price of such security for the purpose of inducing the purchase or sale of such security by others.

146.     As described herein, Defendants Sterritt, Magness, and Ross knowingly or recklessly engaged in unlawful matched trades to create a false appearance of trading activity and to artificially increase the trading price of ORGH securities.

147.     By reason of the conduct described above, Defendants Sterritt, Magness, and Ross, directly or indirectly, have violated, and, unless enjoined and restrained, will again violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## SEVENTH CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act
### (Sterritt, Greer, Pittman, Ross)

148.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 125, as if fully set forth herein.

149.     Defendants Sterritt, Greer, Pittman, and Ross, while engaged in the business of

effecting transactions in securities for the account of others made use of the mails or the means

or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to

induce the purchase or sale of, a security without being registered in accordance with Section

15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

150.     Defendants Sterritt, Greer, Pittman, and Ross have violated, and, unless enjoined

and restrained, will again violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### (All Relief Defendants)

151.     The Commission realleges and incorporates by reference paragraphs 1 through

125, as though fully set forth herein.

152.     By virtue of the foregoing, in the manner described above, Relief Defendants

received investor funds and/or ill-gotten gains for which they gave no bona fide consideration

and to which they have no legitimate claim.

153.     As described herein, the funds acquired by Relief Defendants are traceable to

Defendants' wrongful acts and were acquired under circumstances in which it is not just,

equitable or conscionable for Relief Defendants to retain the funds.

154.      By reason of the conduct described above, Relief Defendants have been unjustly

enriched and should be required to return their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

A final judgment permanently enjoining:

(a)     All Defendants and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise, from any future direct or indirect participation in any offering of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)];

(b)     All Defendants and each of their respective agents, servants, employees, and attorneys, and all persons in active concert or participation with each of them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

(c)     All Defendants and each of their respective agents, servants, employees, and attorneys, and all persons in active concert or participation with each of them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from any future direct or indirect participation in any offering of unregistered securities in violation of Section 17(a) of the Securities Act [15

U.S.C. § 77q(a)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)];

(d)     Defendants Sterritt, Magness, and Ross from violating Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]; and

(e)     Defendants Sterritt, Greer, Pittman, and Ross, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

## II.

Ordering all Defendants, and all Relief Defendants, to disgorge the ill-gotten gains they received with prejudgment interest thereon pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);

## III.

Ordering all Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Ordering a penny-stock bar against all Defendants under Section 20(g) of the Securities Act [15 U.S.C. § 78t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

**V.**

Ordering Defendants Sterritt, Looney, Magness, Mathews, and Pittman to be barred from serving as an officer or director of an issuer pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the violations alleged in this Complaint; and

**VI.**

Granting such other and further relief as this Court deems appropriate and necessary for the benefit of investors.


Dated: New York, New York
       April 14, 2021

SECURITIES AND EXCHANGE COMMISSION


By:    s/ Richard R. Best
       Richard R. Best
       Sanjay Wadhwa
       Alexander M. Vasilescu
       Sheldon L. Pollock
       John O. Enright
       David H. Tutor
       Christine D. Ely (not admitted in EDNY; admitted
       in NY (Bar No. 4737466) and SDNY
       Attorneys for Plaintiff
       United States Securities and Exchange Commission
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       (212) 336-0024 (Tutor)
       Email: tutord@sec.gov